| | |
|---|---|
| **CHRISTINE L. JOHNSTON,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| | )    **Civ. 12-158 Erie** |
| | ) |
| **MICHAEL J. ASTRUE,** | ) |
| **COMMISSIONER OF SOCIAL** | ) |
| **SECURITY,** | ) |
| | ) |
| **Defendant.** | ) |

## OPINION

### I. Introduction

This case is before us on appeal from a final decision by the defendant, Commissioner of Social Security ("the Commissioner"), denying Christine L. Johnston's claim for supplemental security income under Title XVI of the Social Security Act , 42 U.S.C. §§ 1381-1383f. The parties have submitted cross-motions for summary judgment. For the reasons stated below, we will deny the Defendant's motion, grant the Plaintiff's motion, and remand this matter to the Commissioner for an award of benefits.

### II. Procedural History

Christine Johnston applied for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-1383f on September 25, 2008, alleging a disability due to migraine headaches, with an alleged onset date of July 7, 2002. Plaintiff's claim was initially denied on March 10, 2009. A timely request for a hearing was filed by Plaintiff on April 2, 2009. A video hearing was held before an Administrative Law Judge ("ALJ") on June 10, 2010, at which Plaintiff was represented by counsel and testified. R. at 41-67. A vocational expert also testified at the hearing. R. 62-67.

Under the SSA, the term "disability" is defined as the:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months ...

42 U.S.C. § 423. A person is unable to engage in substantial activity when he:

> is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work....

42 U.S.C. §§ 423(d)(1)(A), (d)(2)(A).

In determining whether a claimant is disabled under the SSA, a sequential evaluation process must be applied.  20 C.F.R. § 416.920(a).  See McCrea v. Commissioner of Social Security, 370 F.3d 357, 360 (3d Cir. 2004).  The evaluation process proceeds as follows. At step one, the Commissioner must determine whether the claimant is engaged in substantial gainful activity for the relevant time periods; if not, the process proceeds to step two.  20 C.F.R. 20 C.F.R. § 416.920(b).  At step two, the Commissioner must determine whether the claimant has a severe impairment or a combination of impairments that is severe.  20 C.F.R. § 416.920(c).   If the Commissioner determines that the claimant has a severe impairment, he must then determine whether that impairment meets or equals the criteria of an impairment listed in 20 C.F.R., part 404, Subpart P, Appendix. 1.  20 C.F.R. § 416.920(d).

The ALJ must also determine the claimant's residual functional capacity; that is, the claimant's ability to do physical and mental work activities on a sustained basis despite limitations from his impairments.  20 C.F.R. § 416.920(e).   If the claimant does not have impairment which meets or equals the criteria, at step four the Commissioner must determine whether the claimant's impairment or impairments prevent him from performing his past

relevant work. 20 C.F.R. § 416.920(f). If so, the Commissioner must determine, at step five, whether the claimant can perform other work which exists in the national economy, considering his residual functional capacity and age, education and work experience. 20 C.F.R. § 416.920(g). See also McCrea, 370 F.3d at 360; Sykes v. Apfel, 228 F.3d 259, 262-63 (3d Cir. 2000).

By decision dated August 10, 2010, the ALJ determined that Plaintiff is not disabled under § 1614(a)(3)(A) of the SSA. R. at 10-19. The ALJ found that Plaintiff has the following severe impairments: migraines; cognitive disorder, not otherwise specified; Anxiety; Depression; polysubstance abuse; and a history of neck and shoulder injuries. R. 12.

The ALJ also determined that none of the impairments or combination of impairments meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. R. 22-24.

The ALJ determined that Plaintiff has the residual functional capacity to perform light work, except that she can only stand and walk for up to 5 hours; she can no more than occasionally climb ramps and stairs, occasionally climb ladders, ropes or scaffolds, occasionally balance, stoop, kneel, crouch and crawl, and occasionally reach overhead with the right arm; she must avoid concentrated exposure to hazards; she is limited to performing simple repetitive work; she can engage in only occasional interaction with the public; and she can tolerate only occasional changes in the work setting. R. 14-18.

In making this determination the ALJ made the following credibility determination:

After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

R. 15. He further elaborated on his credibility determination as follows:

In assessing the credibility of the claimant's statements regarding symptoms and their effects on function, her medical history, the character of her symptoms, the type of treatment she received, her response to treatment, and her work history were all considered. To date, her treating has been very routine and conservative in nature. She has no history of hospitalization for migraines, neck and shoulder injuries, or any mental impairments. She has been prescribed antidepressant medications by her primary care physician, with good results. In addition, the undersigned notes that the claimant's daily activities are not significantly limited in relationship to the alleged symptoms. The claimant testified at the hearing that she has been a full-time student since 2008 and drives around 10 miles to school twice a week. The record also indicates that, since the accident, she has had a baby and may have taken a trip to Mexico. She has been prescribed and has taken appropriate medications for the alleged impairments, and the medical records reveal that the medications have been relatively effective in controlling her symptoms.

R. 17.

With regard to the medical evidence the ALJ gave "significant weight" to the February 4, 2009 Psychological Report, r. 274-283, completed by state agency consultative examiner Julie Uran, Ph.D. R. 16. The ALJ also gave "the State agency consultants' opinions" great evidentiary weight. R. 16. Although the ALJ did not specifically identify which state agency consultants' opinions he was referring to, his statement came after reviewing the December 18, 2008 Consultative Examination of John B. Nesbitt, M.D., r. at 268-273; the March 3, 2009 Mental Residual Functional Capacity Assessment of Richard A. Heil, M.D., r. at 284-287; and the March 3, 2009 Physical Residual Functional Capacity Assessment of Kimberly Stavish, r. 302-308. R. 15-16.

In contrast, the ALJ assigned "little weight" to the March 8, 2010 Medical Statement Regarding Pain, r. 311-314, completed by Plaintiff's treating neurologist, Donald Rezek, M.D. R. 17-18.

Considering Plaintiff's age, education, work experience, and residual functional capacity, the ALJ concluded that she is "capable of making a successful adjustment to other work that

exists in significant numbers in the national economy," and therefore she is "not disabled."  R. 19.

Plaintiff filed a timely review of the ALJ's determination, which was denied by the Appeals Council on May 22, 2012.  R. 1-5.  Having exhausted his administrative remedies, Plaintiff filed the instant action seeking judicial review of the final decision of the Commissioner of Social Security denying his SSI application.

## III.  Standard of Review

The Congress of the United States provides for judicial review of the Commissioner's denial of a claimant's benefits.  See 42 U.S.C. § 405(g)(2012).  This court must determine whether or not there is substantial evidence which supports the findings of the Commissioner. See id.  "Substantial evidence is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate.'"  Ventura v. Shalala, 55 F.3d 900, 901 (3d Cir. 1995), quoting Richardson v. Perales, 402 U.S. 389, 401 (1971).  This deferential standard has been referred to as "less than a preponderance of evidence but more than a scintilla."  Burns v. Barnhart, 312 F.3d 113, 118 (3d Cir. 2002).  This standard, however, does not permit the court to substitute its own conclusions for that of the fact-finder.  See id.; Fargnoli v. Massonari, 247 F.3d 34, 38 (3d Cir. 2001) (reviewing whether the administrative law judge's findings "are supported by substantial evidence" regardless of whether the court would have differently decided the factual inquiry).  So long as the ALJ's decision is supported by substantial evidence and decided according to the correct legal standards, the decision will not be reversed.  Id.  To determine whether a finding is supported by substantial evidence, however, the district court must review the record as a whole. 5 U.S.C. § 706(1)(F)(2012).

## IV. Medical Evidence

As noted, Plaintiff filed for Supplemental Security Income alleging a disability due to migraine headaches.  Plaintiff's headaches began as the result of being hit by a car while traveling as a pedestrian in July 2002.  Because Plaintiff's alleged disability is her migraine headaches, her primary medical evidence consists of treatment notes from her neurologist.  In addition, there is record medical evidence of hospital admissions, as well as the records and opinions of consultative and nonconsultative providers addressing both physical and mental assessments.  Finally, there is also a physical assessment completed by a disability examiner who is not a medical source.

### A.  Treating Neurologist Donald Rezek, M.D.

Plaintiff's treating physician is neurologist, Donald Rezek, M.D.  Dr. Rezek's treatment records cover the time period from October 3, 2003 through May 25, 2010.  R. 219-242; 309-327.  Dr. Rezek completed two Medical Source Statements, one dated July 28, 2009, and one dated March 8, 2010.  R. 315; 311-314.

*2003*

When Dr. Rezek first began seeing Plaintiff in October 2003, he diagnosed her with post-traumatic headaches, which he described as primarily migraine in nature, with a tension component, suggestive of cluster headaches, and with "ice pick" headaches.  R. 242.  He stated that the "current plan is to institute a trial of Nortriptyline" to start at 10 mg and to be increased gradually to 30 mg.  R. 243.  At this initial examination Dr. Rezek also had Plaintiff undergo neurologic testing, mental status testing (with comments on memory, general information, attention span, concentration, judgment, speech, language, thought, and affect), cranial nerve examination, visual and auditory testing, motor examination, sensory examination, reflex examination, coordination testing, gait, and a review of her CT scan taken after her accident.  R. 243.

In November 2004, he increased the dosage of Nortriptyline, noting that there had been minimal improvement on the prior dose.  R. 240.   Plaintiff described the headaches as primarily consisting of severe sharp pain, followed by regular headaches, and Dr. Rezek's diagnosis was post-traumatic headaches with an ice pick quality and a more chronic vascular component.  R. 240.

### *2004*

At her January 2004 visit, Dr. Rezek diagnosed post-traumatic headaches with qualities of vascular headaches and components of tension headaches.  Plaintiff was not responding to the Nortriptyline, and Dr. Rezek noted that it was possible that she was having rebound headaches due to her use of analgesics for her pain.  In other words, he explained to her that "taking any pain medicine on a daily basis may put her in a situation where she was perpetuating her problem."  R. 239.  He decided to institute a treatment of Depakote and Naprosyn (which was to be only used for two weeks).  R. 239.

Two months later, in March 2004, Dr. Rezek' impressions were post-traumatic headaches that continue to be chronic, although overall severity has improved.  R. 238.  He noted that she complained of sleeping, still had frequent headaches, but that the headaches seemed to be somewhat better.  R. 238.  Dr. Rezek decided to start her on Amitriptyline, while continuing the Depakote.  R. 238.  In April 2004, Dr. Rezek's impression was chronic headaches that have become less chronic; mixed migraine syndrome, with some headaches local and others generalized; her so-called "regular" headaches are still migraine headaches; and that the headaches are directly related to her accident.  R. 237.  Plaintiff reported that her headaches were not always present but were still problematic, and that she has greater episodes of "headache free time."  R. 237.  Her current medications were continued.  R. 237.

On May 21, 2004, Dr. Rezek's impression was common migraine headaches and problems with sleeping. R. 236. He continued the Depakote and prescribed clonazepam for her sleeping problems. R. 236. On June 25, 2004, his impression was "Headaches[,] that "appear to be frequent and do not totally fit the pattern of migraines[, h]owever the nausea and general throbbing pain characteristics do." R. 235. Plaintiff reported that she was having migraines 3 to 4 times a day. R. 235. He decreased the dosage of clonazepam and instituted a trial of Trazadone for her sleep problems, which he noted may help with her headaches. R. 235.

On July 6, 2004, Dr. Rezek authored a letter to an insurance company concerning whether the recent June visits should be covered by insurance. R. 234. He explained that he sees Plaintiff for chronic post traumatic headaches that "have a mixed tension headache/migraine syndrome" that has been "more difficult to deal with than simple migraine headaches." R. 234. He noted that at the April 2004 visit her headaches seemed to have become less chronic. R. 234. He also noted that her low valproic acid level suggested that Plaintiff was either a fast metabolizer or was not taking the Depakote as ordered and therefore he increased the dosage. R. 234.

On August 17, 2004, Dr. Rezek noted that Plaintiff was taking Trazadone as well as clonazepam (in addition to her Depakote). R. 233. Prior to this visit, she had "gone off both medications because they did not seem to be working anymore" but then she restarted them. R. 233. He also noted that she continues to have headaches she describes as migraines with sharp pains in the side of her head as well as more generalized "regular" headaches. R. 233. The sharp headaches tend to last 30 seconds but are not persistent, and the regular headaches are persistent. R. 233. His impression was, in part, "Migraine headaches with 'ice pick' headache symptoms." R. 233. He suggested that if she took her medication more intermittently rather than being

dependent on it continually, she would get more benefit from it.  R. 233.   In October 2004,

Plaintiff noted fewer headaches.  R. 232.  She was no longer on Trazadone, but was continuing

with Depakote, and Dr. Rezek diagnosed common migraine headaches.  R. 232.

*2005*

On January 11, 2005, Dr. Rezek diagnosed migraine headaches and persistent back pain,

and Plaintiff reported that she felt the Depakote was helping significantly with the headaches

although she still complains of occasional headaches.  R. 231.  The next visit was not until April

19, 2005, at which time Plaintiff complained of having more headaches as well as memory

issues.  R. 230.  Dr. Rezek's impressions were continued headaches with some increased

frequency and severity and complaints of memory problems.  R. 230.  He increased her

Depakote dosage and again started Nortriptyline.  R. 230.

On July 19, 2005, Dr. Rezek noted that Plaintiff "has had significant improvement in her

regular migraines but overall she continues to have frequent ice pick headaches" that "can be

quite severe."  R. 229.  His impression was continued migraine headaches with more of an ice

pick type quality, and he planned to transition her to Topamax, while decreasing her Depakote.

R. 229.

*2006*

Plaintiff was next seen by Dr. Rezek on February 24, 2006, at which time he learned that

Plaintiff was pregnant and was currently on no medications.  R. 228.  Due to the pregnancy he

determined that it was "just as well" that she was not taking the medications and decided not to

initiate any treatment for the migraines.  R. 228.  On April 25, 2006, Dr. Rezek noted that

Plaintiff continued to have significant headaches; that she had not gone for obstetrical care as he

had advised; and that she is to avoid medications for headaches while pregnant.  R. 227.

A week after she gave birth, Plaintiff returned to Dr. Rezek on September 25, 2006, in order to restart her headache medication. R. 226. Dr. Rezek noted that she continued to have severe migraine type symptoms and prescribed Topamax. R. 226. On December 19, 2006, Dr. Rezek reported that Plaintiff's insurance would not cover Topamax until she had first tried another medication, and therefore he prescribed Inderal. R. 225. He noted that the prescription he writes should be larger than usual because the "patient is going to be going out of the country to Mexico." R. 225.

*2007*

Although on December 19, 2006, Dr. Rezek was issuing a prescription for a 3-month supply of Inderal due to Plaintiff's planned trip to Mexico, only two weeks later he increased the dosage of Inderal, and during the month of January he increased it to 60 milligrams with no response. R. 223. This suggests that Plaintiff was available during the three month time period that she was planning to go to Mexico. R. 223. In addition, Dr. Rezek noted on February 22, 2007, that Plaintiff had a history of severe chronic migraine headaches that tended to be chronic and intractable. Because Inderal was not working he concluded that she needed Topamax. R. 223.

On March 20, 2007, Dr. Rezek noted that Plaintiff "had been on different medications for her headaches with no clear response" but that she has "been doing much better since being on Topamax," is more comfortable and able to perform activities, and that his plan is to continue with the Topamax. R. 222. On December 20, 2007, Dr. Rezek reported that Plaintiff had been having trouble getting her Topamax covered by insurance, was not getting adequate relief from the Topamax, and had recently had a significant increase in her headaches with her having headaches for a week or more at a time. R. 221.

*2008*

On June 9, 2008, Dr. Rezek noted that Plaintiff has a history of post traumatic headaches, that her Topamax has been decreased due to her insurance not covering it, and he planned to increase her Topamax and add Amitriptyline.  R. 220.  On September 29, 2008, Dr. Rezek noted significant improvement in her headaches but that she still has problems, and his impression was chronic headaches, with patient doing somewhat better.  R. 219.  On November 7, 2008, Dr. Rezek added a trial of clonazepam.  R. 327.  On December 30, 2008, Dr. Rezek noted the Plaintiff's "long standing history of accident-induced migraines, and that they tend to be better if she is on Topamax, and thus she should restart Topamax.  R. 326.

*2009*

On March 26, 2009, Dr. Rezek reported that Plaintiff has had increased headaches even though she is taking Topamax.  R. 325.  On April 14, 2009, Dr. Rezek noted that Plaintiff has chronic headaches, is on Topamax, and is also taking Excedrin Migraine on an almost daily basis.  R. 324.  He prescribed a Medrol Dosepak in order to see if that could "break the current intractable headache."  R. 324.  He discussed his concerns about analgesic rebound headaches due to frequent daily use of pain medication.  R. 324.  He prescribed Naprosyn and ordered her to not take other pain medications during this time.  R. 324.

On May 26, 2009, the doctor noted her chronic headaches, but the visit appeared to be focused on possible carpal tunnel symptoms.  R. 323.  On June 18, 2009, Dr. Rezek noted "continued problems with chronic headaches" and started a prescription of Tizanidine.  R. 322.  On July 23, 2009, Dr. Rezek noted her continued chronic headaches since the time of her accident in 2002, with some of them being more severe.  R. 321.   He noted that the headaches "seem to actually be getting worse," and referred her to Wexford Headache Clinic because she seems to be unable to understand the nature of her headaches."  R. 321.   Dr. Rezek also noted that Plaintiff brought in a Social Security form (a Medical Source Statement).  R. 321.

*Medical Source Statement No. 1*

Dr. Rezek completed his first Medical Source Statement, dated July 28, 2009, in which he found that Plaintiff has migraine headaches, muscle tension headaches, and post-traumatic headaches.  R. 315.  He noted that her symptoms were photophobia, irritability, and increased sensitivity to noise.  R. 315.  He indicated that the headaches were daily and lasted several hours, and he commented that the headaches are described as getting worse.  R. 315.  He opined that Plaintiff was not able to work while suffering a headache.  R. 315.

On September 3, 2009, Plaintiff told Dr. Rezek that her headaches are becoming more severe and described the pain as more of a pressure sensation.  R. 320.  He noted that she has been on Topamax "without a whole lot of benefit" and that she continues to have daily headaches.  R. 320.  Dr. Rezek also noted that she takes a "certain amount of OTC medication" and that she has been taking Vicodin for breakthrough headaches, taking it more regularly that planned initially.  R. 320.  He planned to have her try Migranal in a nasal spray.  R. 320.

On November 5, 2009, Dr. Rezek's impression was chronic daily headaches that do not seem to be responding to medication, and he noted "Poor response to anti-migraine medicine." R. 319.  He noted that apparently the Migranal was not helpful, and planned to continue present medications.  R. 319.

### *2010*

On February 4, 2010, Dr. Rezek reported that Plaintiff had been to the Headache Center and was seen by Dr. Kaniecki who "recognize[d] the cause of the headaches but felt the headaches had an element of analgesic overuse."  R. 318.  Dr. Rezek also reported the following:

> She states that she has tried to go off her medications for periods of time, and that certainly did not seem to help the headaches.  She has been on medications designed to treat the headache.

R. 318. His impression was chronic headaches, that "seem to be poorly responsive to prophylactic medication despite her being off chronic medication at times" and that he could not "entirely rule out a component of analgesic rebound headaches." R. 318.

On March 2, 2010, Dr. Rezek noted that Plaintiff was not getting a benefit from the use of Amitriptyline, but that "Topamax has been useful for cutting down the severity of headaches, but she continues to have rather chronic headache[s]." R. 317. He also noted that she brought forms for Dr. Rezek to complete. R. 317. On May 6, 2010, Dr. Rezek noted that Plaintiff's headaches are under fair control with both prophylactic and acute medications. R. 316.

### Medical Source Statement No. 2

Dr. Rezek's second Medical Source Statement is dated March 8, 2010. R. 311-314. In this Statement, Dr. Rezek diagnosed Plaintiff with "chronic daily headache" and indicated that she suffered from "Severe" pain. R. 311. He indicated that she had marked difficulty in maintaining social functioning and had deficiencies of concentration, persistence or pace resulting in frequent failure to complete tasks in a timely manner due to pain. R. 311. He indicated that her "symptoms slow [patient] and decrease concentration." R. 311.

Dr. Rezek described her symptoms as "Intractable headache with exacerbation" and that the headaches have been present since her 2002 accident. R. 312. For his findings on most recent examination, Dr. Rezek noted continued headaches. R. 312.

As part of the Medical Source Statement, Dr. Rezek also completed a medical assessment of ability to do work-related activities (mental). R. 313-314. Here, Dr. Rezek noted that Plaintiff had poor ability to deal with the public, interact with supervisors, and to function independently; a fair ability to follow work rules, relate to co-workers, and deal with the public; and no ability to deal with stress or maintain attention and concentration. R. 313. He noted that her headaches were aggravated by stress. R. 313.

Dr. Rezek also noted a fair ability to understand, remember and carry out simple job instructions; a poor ability to understand, remember and carry out detailed, but not complex, instructions, and no ability to understand, remember and carry out complex job instructions. R. 314. He also noted that she had a poor ability to demonstrate reliability personally and socially, and a fair ability to behave in an emotionally stable manner and to relate predictably in social situations. R. 314.

## B. Hospital Records

Plaintiff has had three Emergency Room visits regarding her headaches. The first visit occurred at the Meadville Medical Center ER on June 25, 2007, at which time her chief complaint was a headache, worsened by bright light and noise; and described as similar to previous headaches, with severity being "severe." R. 258. She reported that she has had similar symptoms and that her headaches occurred frequently. R. 329. She was given pain medicine (Regan) by IV, and discharged that same day. R. 329.

Next, on October 20, 2007, she reported to the Meadville Medical Center ER complaining of migraine headaches that had lasted for four days. R. 253.

Finally, on May 25, 2010, Plaintiff was seen at the Meadville Medical Center ER. R. 329-330. Her chief complaint was a headache that is gradual in onset and has been constant, and she stated that it was exactly like her prior headaches. R. 329. The clinical impression was acute headache, migraine headache. R. 330. She was given IV pain medications. R. 330.

## C. State Agency Providers and Disability Examiner

Plaintiff was sent by the Commissioner for a physical consultative examination as well as a psychological consultative examination. In addition, a non-examining psychologist and a disability examiner completed, respectively, a mental and physical assessment form.

1. **John B. Nesbitt, M.D.: 12/18/2008 Consultative Physical Assessment**

Dr. Nesbitt, an internal medicine doctor, examined Plaintiff on December 18, 2008 and completed a Medical Source Statement regarding Plaintiff's work-related physical abilities, with a range of motion chart. R. 268-273. Because Dr. Nesbitt was performing a physical examination his report naturally focuses on physical abilities. He noted that she "has been saddled with headaches, which Dr. Rezek has felt were posttraumatic migraines." R. 268. Dr. Nesbitt also indicated that he did a "very abbreviated mental status examination" in which she performed serial sevens accurately but very slowly, and was only able to remember two of three words when asked to recall them. R. 269. His impressions were "1. Orthopedic problems due to neck and back and right shoulder injury"; and "2. Posttraumatic migraines and by history memory deficit related to head injury. Evidently she had a migraine, but she did not have anatomically detectable brain injury at the time of the accident." R. 269.

Dr. Nesbitt's examination revealed that Plaintiff had satisfactory gait, and satisfactory range of motion of the extremities, except for pain on raising her right arm overhead, and that she could lift and carry 10 pounds frequently, and 20-25 pounds occasionally. R. 270.

2. **Julie Uran, Ph.D.: 2/4/2009 Consultative Mental Assessment**

Dr. Uran, a psychologist, performed a psychological consultative examination on February 4, 2009. R. 274-283. In addition to her Psychological Report, Dr. Uran also completed a checkmark form assessing various activities and abilities, and a checkmark assessment form concerning Plaintiff's abilities to perform various work-related functions. R. 280-283.

Dr. Uran noted with regard to Plaintiff's interaction with public that she is distrustful and avoids interaction and that she can anger in interacting with the public. R. 281. Dr. Uran further noted that Plaintiff is hindered by physical health and overwhelmed with respect to:

concentration and task persistence as to schedule; performing a task from beginning to end; routine; and consistent pace. R. 281. She also noted that Plaintiff would be overwhelmed by instructions. R. 281.

Dr. Uran found that Plaintiff had moderate work-related restrictions only as to her ability to understand and remember detailed instructions; to carry out detailed instructions; to interact appropriately with the public; and to respond appropriately to work pressures in a usual work setting. R. 282. She otherwise found that Plaintiff had no restrictions. R. 282-283.

### 3. Richard A. Heil, Ph.D.: 3/3/2009 Non-examining Mental Assessment

Dr. Heil, a non-treating state agency psychologist, completed a mental residual functional capacity form dated March 3, 2009. R. 284-287. Dr. Heil found that Plaintiff was not significantly limited in most areas, but that she was moderately limited in the following areas:

- ability to understand and remember detailed instructions;

- ability to carry out detailed instructions;

- ability to maintain concentration for extended periods;

- ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances;

- ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods;

- ability to interact appropriately with the general public;

- ability to accept instructions and respond appropriately to criticism from supervisors;

- ability to respond appropriately to changes in the work setting;

- ability to set realistic goals or make plans independently of others.

R. 284-285.

In his narrative explanation of findings, Dr. Heil noted evidence of some memory loss, but that her memory was adequate to allow for performance of basic work related tasks. R. 286. He further found that she was able to carry out simple instructions; to maintain concentration and attention for extended periods, and would be able to maintain regular attendance and be punctual. R. 286. Dr. Heil gave Dr. Uran's report "great weight" in his assessment. R. 286.

### 4. Kimberly Stavish: 3/3/2009 Non-examining Physical Assessment

Kimberly Stavish, a non-treating disability examiner who is neither a medical or health professional, completed a physical residual functional capacity form dated March 3, 2009. R. 302-308. Ms. Stavish's conclusions were consistent with a finding that Plaintiff would be able to perform light work. In her narrative explanation of findings, Ms. Stavish noted that Plaintiff has a history of headaches and that her "last evaluation with Dr. Rezek her neurologist noted significant improvement with her headaches since being on Topamax." R. 307. She also explained as follows:

> The claimant has described daily activities that are not significantly limited in relation to her alleged symptoms. She is able to drive a car. Furthermore, she received treatment from a specialist for her Migraines. She takes Topamax for her migraines but takes no pain meds for her alleged back and neck pain. She does not require an assistive device to ambulate. She does not use a Tens unit.

R. 307. Ms. Stavish gave Dr. Nesbitt's report "appropriate weight." R. at 307-308.

## V. Discussion

Plaintiff argues that the ALJ failed to properly consider the medical evidence of record and erred by engaging in an improper and selective review of the evidence of record. Plaintiff thus challenges the ALJ's residual functional capacity finding claiming that the ALJ erred in

failing to adequately account for her migraine headaches.  Plaintiff also argues that because the ALJ did not adequately consider the medical evidence, he also erred in his credibility determination.

We agree with Plaintiff that the ALJ erred in his evaluation of the medical evidence and in his credibility finding, which resulted in error in the ALJ's residual functional capacity finding.


### A.  Evaluation of the Medical Evidence

As the finder of fact, the ALJ is required to review, properly consider and weigh all of the medical records provided concerning the claimant's claims of disability.  Fargnoli, 247 F.3d at 42, citing Dobrowolsky v. Califano, 606 F.2d 403, 406-07 (3d Cir.1979).  "In doing so, an ALJ may not make speculative inferences from medical reports."  Plummer v. Apfel, 186 F.3d 422, 429 (3d Cir. 1999), citing Smith v. Califano, 637 F.2d 968, 972 (3d Cir.1981).  "A cardinal principle guiding disability eligibility determinations is that the ALJ accord treating physicians' reports great weight, especially 'when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time.'"  Morales v. Apfel, 225 F.3d 310, 317 (3d Cir.2000), quoting Plummer, 186 F.3d at 429 (citations omitted).  While an ALJ may reject a treating physician's assessment, he may do so "'outright only on the basis of contradictory medical evidence' and not due to his or her own credibility judgments, speculation or lay opinion."  Id., quoting Plummer, 186 F.3d at 429 (citations omitted); 42 U.S.C.A. § 423(d)(1)(A).  Indeed, the ALJ may not substitute his own opinions for the opinions of an examining physician.  Plummer, 186 F.3d at 422, citing Ferguson v. Schweiker, 765 F.2d 31, 37 (3d Cir.1985).

When the medical evidence provided by a treating physician or physician conflicts with other medical evidence of record "the ALJ may choose whom to credit but 'cannot reject evidence for no reason or for the wrong reason.'" Id., citing Mason v. Shalala, 994 F.2d 1058, 1066 (3d Cir.1993). Moreover, The ALJ must consider all the evidence and give some reason for discounting the evidence he rejects. Stewart v. Secretary of H.E.W., 714 F.2d 287, 290 (3d Cir. 1983); 42 U.S.C.A. § 423(d)(1)(A). Finally, "[i]f a treating physician's opinion is rejected, the ALJ must consider such factors as the length of the treatment relationship, the nature and extent of the treatment relationship, the supportability of the opinion, the consistency of the opinion with the record evidence, any specialization of the opining physician and other factors the plaintiff raises, in determining how to weigh the physician's opinion." Sanchez v. Barnhart, 388 F.Supp. 2d 405, 412 (D.Del.2005), citing 20 C.F.R. § 404.1527(d)(2)-(6).

> Under applicable regulations and the law of this Court, opinions of a claimant's treating physician are entitled to substantial and at times even controlling weight. *See* 20 C.F.R. § 404.1527(d)(2); Cotter, 642 F.2d at 704. The regulations explain that more weight is given to a claimant's treating physician because
>
>> these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.
>
> 20 C.F.R. § 404.1527(d)(2). Where a treating source's opinion on the nature and severity of a claimant's impairment is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record," it will be given "controlling weight." Id.

Fargnoli, 247 F.3d at 43. The Commissioner will apply the following factors in determining the weight to be given to a treating physician: (1) the length of treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) whether the

diagnosis is supported by the source's findings; (4) whether the diagnosis is consistent with the record as a whole; (5) whether the source is a specialist in any given area; and (6) any other reason to give a particular source weight in determining disability.  20 C.F.R. § 404.1527(d).

Dr. Rezek, Plaintiff's treating neurologist, has been treating Plaintiff continually for nearly eight years.  The record in this case contains Dr. Rezek's medical records since shortly after the accident that caused the migraine headaches to shortly before the hearing in this matter.  However, the ALJ reviewed only a selected portion of Dr. Rezek's medical records, focused on unnecessary areas, and placed undue emphasis on only two treatment notes.   The ALJ does not refer to Dr. Rezek's treatment records until after he discussed records from the non-examining State agency disability analyst, the examining State agency physical consultant, the non-examining State agency psychological consultant, and the examining State agency psychological consultant.  We conclude that the ALJ's over-reliance on the State agency records and opinions and under-examination of Dr. Rezek's medical records is error.

The ALJ explicitly stated that he was giving "significant weight" to the opinion of the examining State agency psychological consultant, Julie Uran. Ph.D., "[a]s did the [non-examining] State agency [psychological] consultant," Richard Heil, Ph.D.  R. 16.  The ALJ had previously stated that Dr. Heil had assigned "great weight" to Dr. Uran's report.  R. 15.  The ALJ's assignment of evidentiary weight given to the other State agency records is less specific; however, his statement that the "State Agency consultants' opinions are accorded great evidentiary weight" leads to the conclusion that the ALJ gave "great weight" to all of the State agency records.  In comparison, the ALJ gave "little weight" to the opinion of Dr. Rezek.  R. 18.  We find that the ALJ erred in the weight assigned to the medical evidence.

The ALJ chose to emphasize, in part, findings that are essentially irrelevant to the impact Plaintiff's migraine headaches have on her ability to work. The ALJ notes that Plaintiff had unremarkable neurological examinations; normal cranial nerve examinations and coordination testing; no motor, reflex, or sensory deficit in upper or lower extremities; normal gait and station; minor limitations of neck movement; back and leg discomfort; and problems with insomnia. R. 16. In fact, none of these findings are at issue in this case and reference to them in the ALJ's opinion suggests that the ALJ was requiring that Plaintiff prove that she had limitations unrelated to her alleged disability of migraine headaches.

With regard to the migraine headaches, the ALJ states in his opinion that the "records from the claimant's treating neurologist, Donald Rezek, MD, indicate that she had variable response to a number of medications, but has gained significant improvement in the frequency, duration and intensity of her post traumatic headaches with Topamax." R. 16. This reference to "significant" improvement with Topamax appears in the September 29, 2008 treatment note in which Dr. Rezek noted that Plaintiff was taking Topamax and "has had significant improvement in her headaches, but she still has some problems." R. 219.

The ALJ only focuses on the first part of Dr. Rezek's statement and ignores the fact that Dr. Rezek continued by stating that Plaintiff still has problems. We also note that the ALJ fails to address or account for the extensive treatment notes dated from 2003 up to the September 2008 record.

The ALJ similarly fails to discuss or address treatment notes from late 2008 through March 2010 and instead chooses to focuses only on the May 2010 treatment note. The ALJ purports to summarize nearly two years of treatment notes when he states that the updated records "further support a finding that the claimant's headaches are under good control with a

combination of prophylactic and acute care medications, with no new signs, symptoms, or indication of acute exacerbation in severity or frequency of the headaches." R. 16, citing Dr. Rezek's treatment notes dated from November 7, 2008 to May 6, 2010, r. 309-327. However, it is apparent that the ALJ is focusing only on the May 6, 2010 treatment note in which Dr. Rezek noted that Plaintiff's headaches are under *fair* control with both prophylactic and acute medications. R. 316. Because Dr. Rezek is Plaintiff's longtime treating specialist the ALJ must do more than rely on a single treatment note taken out-of-context. Instead it is incumbent on the ALJ to explain how the treatment notes in 2009 and 2010 leading up to the May 6, 2010 treatment note support his conclusion.

Our review of the prior records reveals the following. In 2009 Plaintiff had increased headaches even though she is taking Topamax (March); she has chronic headaches including a present intractable headache (April); continued problems with chronic headaches (June); and some of the chronic headaches are more severe, and the headaches seem to actually be getting worse (July). In 2010 the records reveal that Plaintiff had chronic headaches that seem to be poorly responsive to prophylactic medication despite her being off chronic medication at times (February); she was not getting a benefit from a recent medication; and Topamax has been useful for cutting down the severity of headaches, but she continues to have chronic headaches (March). Finally, we reach the May 2010 treatment note that indicates fair control with both prophylactic and acute medications.

It is clear when the history of treatment is reviewed in context that Dr. Rezek did not mean that Plaintiff's headaches were under "good" control as characterized by the ALJ. It is apparent that Dr. Rezek felt that at best Plaintiff's headaches were under fair control. This is consistent with the entire treatment record. Read in context, Dr. Rezek meant that even though

Plaintiff is taking Topamax she still has increased headaches, she still has chronic headaches, and that some of the headaches are more severe.  At best, Dr. Rezek felt that Topamax cuts down the severity of headaches but does nothing to relieve Plaintiff's chronic headaches.

As noted, the ALJ gave Dr. Rezek's opinion contained in his March 8, 2010 Medical Source Statement "little weight" explaining that "it overstates the severity of the claimant's impairments and is based mostly on the claimant's subjective complaints."  R. 17-18.  The ALJ fails to reconcile his assignment of little weight given to Dr. Rezek's opinion with the longitudinal objective medical records from Dr. Rezek that are in accord with his opinion.  This failure is not surprising given that the ALJ chose not to address the majority of Dr. Rezek's treatment notes, overemphasized two treatment notes and misconstrued a report of "fair control" as "good" control.  To the extent the ALJ substituted his lay opinion for Dr. Rezek's opinion it was error.

We also note that the ALJ failed to even mention Dr. Rezek's July 28, 2009 Medical Source Statement.   While the ALJ must not cite every piece of medical evidence, a Medical Source Statement from a long-time treating source is certainly relevant evidence.  The fact that it is consistent with the treatment notes up until that point and also consistent with Dr. Rezek's second opinion are reasons why one would expect the ALJ to address this evidence in his opinion.

This leads us to the ALJ's consideration of the State agency consultants.  Plaintiff's counsel strongly argues that the ALJ committed serious errors in his handling of these records.  We agree.  We need not address the deficiencies of these opinions in detail.

With regard to Dr. Nesbitt's physical consultative examination, the most significant aspect is that Dr. Nesbitt is not a neurologist and he did not examine Plaintiff for the impact her

migraine headaches would have on her abilities.  Plaintiff did not allege disability due to any orthopedic limitations.  The fact that the ALJ noted that Dr. Nesbitt found no neurological deficits is not surprising given that Dr. Nesbitt did not review neurological symptoms.  To the extent that the ALJ gave Dr. Nesbitt's opinions great weight we find that this was error.

The ALJ also appears to rely on the opinion of a non-examining disability examiner who is not a medical source.  Ms. Stavish is "a layperson who has never seen the plaintiff."  P. Br. 17. The only circumstance in which a disability examiner alone may render a disability determination is when there is no evidence to be evaluated.  20 C.F.R. 416.1015(c)(2). Moreover, Ms. Stavish's opinion is also deficient, in part, for singling out a single treatment note (the same September 2008 treatment note the ALJ relies on) but failing to refer any other treatment notes.  The ALJ's reliance on Ms. Stavish's opinion is error.

As noted, the ALJ also relied on the opinions of the non-examining State agency psychological consultant, and the examining State agency psychological consultant.  However, because these opinions address Plaintiff's mental abilities (not her abilities as a result of migraine headaches) and Plaintiff does not assert that she has any mental disabilities.  We need not address the ALJ's reliance on them.

It is apparent from our review of Dr. Rezek's treatment notes that the ALJ ignored relevant information, and erred in not according "great weight" to Dr. Rezek's medical records and his opinion.  Dr. Rezek's opinion "reflect[s] expert judgment based on a continuing observation of the patient's condition over a prolonged period of time."  Rocco v. Heckler, 826 F.2d 1348, 1350 (3d Cir. 1987); 20 C.F.R. § 404.1527(d)(2).  Moreover, Dr. Rezek's medical records are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and are "not inconsistent with the other substantial evidence in [the claimant's] case

record," and thus should have been given "controlling weight." 20 C.F.R. § 404.1527(d)(2): <u>see also</u> <u>Fargnoli</u>, 247 F.3d at 43. Significantly, in over six years of continuous treatment Dr. Rezek never expressed the belief that Plaintiff's headaches were not causing her the symptoms and pain expressed by Plaintiff. Accordingly, we conclude that the ALJ erred in his evaluation of the medical evidence.

## B. Credibility Determination

Plaintiff argues that because the ALJ failed to adequately consider the medical evidence that the ALJ also erred in his consideration of Plaintiff's subjective complaints of pain. We agree and find that the ALJ erred in his credibility determination.

The Social Security Administration has set forth factors describing how allegations of subjective symptoms, such as pain, are to be evaluated. *See* 20 C.F.R. § 404.1529. Subsection (c), relating to the evaluation of intensity and persistence of pain, reads in pertinent part as follows:

> (1) General. When the medical signs or laboratory findings show that you have a medically determinable impairment(s) that could reasonably be expected to produce your symptoms, such as pain, we must then evaluate the intensity and persistence of your symptoms so that we can determine how your symptoms limit your capacity for work ....

> (2) Consideration of objective medical evidence. Objective medical evidence is evidence obtained from the application of medically acceptable clinical and laboratory diagnostic techniques, such as evidence of reduced joint motion, muscle spasm, sensory deficit or motor disruption .... However, we will not reject your statements about the intensity and persistence of your pain or other symptoms or about the effect your symptoms have on your ability to work solely because the available objective medical evidence does not substantiate your statements.

> (3) Consideration of other evidence. Since symptoms sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone, we will carefully consider any other information you may submit about your symptoms. The information that you, your treating or examining physician or psychologist, or other persons provide about your pain

> or other symptoms ... is also an important indicator of the intensity and persistence of your symptoms.

20 C.F.R. § 404.1529(c).

The Court of Appeals for the Third Circuit has elaborated on these regulations. "Subjective complaints must be given 'serious consideration.'" <u>Burns</u>, 312 F.3d at 129, citing <u>Mason</u>, 994 F.2d at 1067; <u>Green v. Schweiker</u>, 749 F.2d 1066, 1068 (3d Cir.1984)). Such "serious consideration" is to be given "even when those complaints are not supported by objective evidence." <u>Mason</u>, 994 F.2d at 1067, citing <u>Ferguson</u>, 765 F.2d at 37. There need not be objective evidence of the pain itself, but there must be objective evidence of some condition that could reasonably produce pain. <u>Mason</u>, 994 F.2d at 1067, quoting <u>Green v. Schweiker</u>, 749 F.2d 1066, 1071 (3d Cir.1984).

When supported by objective medical evidence, a claimant's subjective complaints are entitled to "great weight." <u>Mason</u>, 994 F.2d at 1067; <u>Green</u>, 749 F.2d at 1068-71 (3d Cir.1984). A claimant's subjective complaints of pain supported by competent evidence cannot be disregarded "unless there exists contrary medical evidence." <u>Mason</u>,994 F.2d at 1067-1068.

Once an ALJ determines that a claimant has an impairment "'which is reasonably expected to produce some pain, they must consider all of the evidence relevant to the individual's allegations of pain, even if the alleged pain is more severe or persistent than would be expected.'" <u>Sykes v. Apfel</u>, 228 at 266 n.9, quoting <u>Evaluation of Symptoms, Including Pain</u>, 56 Fed.Reg. 57,932 (1991) (interpreting regulations regarding the evaluation of symptoms including pain, 20 C.F.R. § 404.1529)). "Where the Secretary is faced with conflicting evidence, he must adequately explain in the record his reasons for rejecting or discrediting competent evidence." <u>Sykes</u>, 228 F.3d at 266 n.9 (quotations and citations omitted). Similarly, "[i]f the ALJ determines that the claimant's subjective testimony is not fully credible, the ALJ is obligated to

explain why.  Burns, 312 F.3d at 129, quoting Burnett v. Commissioner, 220 F.3d 112, 120 (3d Cir.2000)).

In support of his credibility finding the ALJ remarked on Plaintiff's credibility in relation to the medical evidence:

> In assessing the credibility of the claimant's statements regarding symptoms and their effects on function, her medical history, the character of her symptoms, the type of treatment she received, her response to treatment, and her work history were all considered.  To date, her treating has been very routine and conservative in nature.  She has no history of hospitalization for migraines, neck and shoulder injuries, or any mental impairments.  She has been prescribed antidepressant medications by her primary care physician, with good results. . . .  She has been prescribed and has taken appropriate medications for the alleged impairments, and the medical records reveal that the medications have been relatively effective in controlling her symptoms.

R. 17.  In light of our discussion of the medical evidence we cannot say that the ALJ has adequately supported his credibility finding by relying on medical evidence of record.

To the contrary, our review of Dr. Rezek's extensive medical records shows objective evidence of chronic migraine headaches of varying types that could reasonably produce pain and therefore Plaintiff's subjective complaints are entitled to "great weight."  Mason, 994 F.2d at 1067.  It was error for the ALJ to disregard Plaintiff's subjective complaints of pain in light of the fact that he failed to show that there existed contrary medical evidence. Mason, 994 F.2d at 1067-1068.

The ALJ also remarked on Plaintiff's credibility in relation to her daily activities as follows:

> the undersigned notes that the claimant's daily activities are not significantly limited in relationship to the alleged symptoms.  The claimant testified at the hearing that she has been a full-time student since 2008 and drives around 10 miles to school twice a week.  The record also indicates that, since the accident, she has had a baby and may have taken a trip to Mexico.

R. 17.

The Plaintiff did testify that she was a student at DeVry; however, she testified that at the time of the hearing she was only taking two classes, and only had to drive to campus for one class once per week. R. 48, 50. That class met once a week for three hours. R. 48. The other class was online and did not require her to be physically present at the school. R. 54. She also testified that she was unable to attend the in-person class once or twice a month. R. 54. She also testified that prior to DeVry, she attended the Erie Institute of Technology for less than a year. R. 51, 55. At the Erie Institute of Technology, she had classes five days a week, and testified that she was unable to attend two of the five days as a result of her headaches. R. 55.

Again, the medical evidence from Dr. Rezek supports Plaintiff's testimony that she would be unable to attend school on a regular basis as a result of her chronic headaches, consistent with how she testified. If addition, while the ALJ refers to Plaintiff's testimony regarding attending school he did not explain how this testimony supports a finding that Plaintiff would be able to work in light of her credible testimony regarding her inability to attend school on a regular basis.

The ALJ also refers to Plaintiff having had a baby and possibly having taking a trip to Mexico as evidence that Plaintiff is not credible as to her abilities. We are uncertain as to what criteria the ALJ relied on in using parenthood and a single planned trip in order to find a claimant not credible with regard to ability to work. The records reveal that Plaintiff had a baby. There is no other mention in the medical records of any affect that this has had on Plaintiff. The ALJ did not ask any questions about Plaintiff's child at the hearing, and she testified that she lives alone. R. 46.

With regard to the trip to Mexico, the only record evidence regarding the trip is a single notation in Dr. Rezek's December 19, 2006 treatment note in which he noted that the

prescription he writes should be larger than usual because the "patient is going to be going out of the country to Mexico." R. 225. At the hearing Plaintiff testified that she did not take the trip to Mexico. R. 62. We also note that it is implied in Dr. Rezek's ensuing treatment notes that Plaintiff did not go to Mexico and was still in town. R. 223.

We are at a loss as to what significance this has to the issue of Plaintiff's alleged disability or her credibility. We cannot tell if the ALJ's credibility determination is influenced by the fact that Plaintiff "may" have taken a trip, or that she at one time planned to take a trip, or that the ALJ actually believed Plaintiff took the trip had no record evidence to support this assertion. We conclude that the reference to the trip to Mexico, as well as the fact of Plaintiff's parenthood, are not factors supporting a finding that the Plaintiff is not credible.

### C. Residual Functional Capacity Determination

When determining an individual's residual functional capacity the ALJ must consider all relevant evidence. Fargnoli, 247 F.3d at 40, citing 20 C.F.R. §§ 404.1527(e)(2), 404.1545(a), 404.1546; Burnett, 220 F.3d at 121. That evidence includes medical records, observations made during formal medical examinations, descriptions of limitations by the claimant and others, and observations of the claimant's limitations by others. Fargnoli, 247 F.3d at 40, citing 20 C.F.R. § 404.1545(a).

In light of our review of the medical evidence we conclude that the ALJ did not thoroughly evaluate and weigh the medical evidence. The ALJ's residual functional capacity determination fails to account for Plaintiff's limitation as supported by her testimony and Dr. Rezek's medical records as well as his opinion. In addition, there was not substantial evidence in the record that was inconsistent with or contradicted Dr. Rezek's opinion. We therefore

conclude that the vocational expert's assessment of Plaintiff's ability to perform work was based on a flawed hypothetical because it failed to account for all of her limitations.

The United States Court of Appeals for the Third Circuit instructs that a

vocational expert's testimony concerning a claimant's ability to perform alternative employment may only be considered for purposes of determining disability if the question accurately portrays the claimant's individual physical and mental impairments. A hypothetical question posed to a vocational expert must reflect all of a claimant's impairments.

Burns, 312 F.3d at 123 (citations omitted); see also Chrupcala v. Heckler, 829 F.2d 1269, 1276 (3d Cir. 1987); Podedworny v. Harris, 745 F.2d 210, 218 (3d Cir. 1984). In response to individual hypotheticals that included varying descriptions of Plaintiff's limitations, posed by both the ALJ and Plaintiff's counsel, the vocational expert responded that there would be no jobs for Plaintiff. R. 64-65 (the hypotheticals contained the following limitations: Plaintiff would incur unexcused and unscheduled absences; would be off task 40% of the time; would be unable to perform full-time work eight hours a day for five days a week; would need to lie down at unpredictable times for two hours three days per week; and would be off task two hours in an eight-hour workday). Accordingly, we will find that Plaintiff is disabled.

**D. Substantial Evidence**

Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Plummer, 186 F.3d at 427. "Despite the deference due to administrative decisions in disability benefit cases, 'appellate courts retain a responsibility to scrutinize the entire record and to reverse or remand if the [Commissioner]'s decision is not supported by substantial evidence.' " Morales v. Apfel, 225 F.3d at 317, quoting Smith, 637 F.2d at 970.

Reviewing the supporting evidence and the ALJ's reasoning and review of the evidence as it underlies the ALJ's opinion, we find that the ALJ's rejection of Dr. Rezek's opinion is not supported by substantial evidence. The body of the ALJ's opinion contains minimal and selective reference to Dr. Rezek's six-plus years of treatment notes, and the ALJ fails to point to substantial contradictory medical evidence. We further find that the ALJ's conclusion that Plaintiff was not fully credible regarding her limitations is not supported by substantial evidence.

With regard to determining Plaintiff's residual functional capacity the ALJ did not consider "all relevant evidence." Fargnoli, 247 F.3d at 40, citing 20 C.F.R. §§ 404.1527(e)(2), 404.1545(a), 404.1546; Burnett, 220 F.3d at 121. The ALJ failed to account for the limitations as set forth by Dr. Rezek and confirmed by Plaintiff's testimony, which was not inconsistent with or contradicted by other substantial evidence. Thus, we conclude that the ALJ's residual functional capacity determination is in error as it is not supported by substantial evidence.

For similar reasons, and for the reasons set forth in our analysis, we also conclude that the ALJ erred in disregarding the vocational expert's response to hypothetical question that contained Plaintiff's limitations. The vocational expert testified that there would be no jobs for a person who had Plaintiff's limitations as set forth in various hypotheticals posed to the expert. Given our evaluation of the evidence, our findings and conclusions, we therefore adopt the vocational expert's response that there are no jobs existing for someone with Plaintiff's limitations and thus she is not able to be employed. Therefore, we find that she is disabled.

Accordingly, we will reverse the decision of the Commissioner and remand for an award of benefits.

## V. Conclusion

For the foregoing reasons, and based upon our review of the record as a whole, we hold that the decision of the Commissioner that Plaintiff was not disabled is not supported by substantial evidence in the record. Therefore, we will deny Defendant's motion for summary judgment. In addition, for the above stated reasons, the decision of the Commissioner denying Plaintiff's claim for supplemental security income must be reversed. This matter is remanded to the Commissioner for insurance benefits to be calculated and awarded to Plaintiff.

An appropriate order will be entered.


*August 28, 2013*
Date

*Maurice B. Cohill, Jr.*
Maurice B. Cohill, Jr.
Senior United States District Court Judge